# Effect of a Recent United Nations Security Council Resolution on the Authority of the President Under International Law to Use Military Force Against Iraq

United Nations Security Council Resolution 1441 does not alter the legal authority, under international law, granted by existing U.N. Security Council resolutions to use force against Iraq.

November 8, 2002

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked our Office to analyze the effect of United Nations ("U.N.") Security Council Resolution 1441, adopted on November 8, 2002, on the President's authority under international law to use military force against Iraq. We recently advised you that the use of military force against Iraq would be consistent with international law under existing U.N. Security Council resolutions ("UNSCRs"), or as an exercise of anticipatory self-defense. *See Authority of the President Under Domestic and International Law to Use Military Force Against Iraq*, 26 Op. O.L.C. 143 (2002) ("Iraq Opinion"). The terms of UNSCR 1441 do not alter our earlier conclusion: the United States continues to have the authority, under international law, to use force against Iraq.[1]

We emphasize at the outset that U.N. Security Council authorization is not a necessary precondition under international law for the use of force. On numerous occasions, states have, consistent with international law, used force without prior authorization from the Security Council. Such uses of force have been based on the inherent right to national self-defense recognized and affirmed in article 51 of the U.N. Charter. *See generally* Iraq Opinion, 26 Op. O.L.C. at 178, 181-82. Under the doctrine of anticipatory self-defense, the United States may use force against Iraq if the President determines the use of force would be necessary due to an imminent threat, and a proportional response to that threat. *See generally id*. at 177-95.

We also emphasize that the question of legality of the use of force against Iraq under international law has no bearing on the President's authority under domestic law. As we have advised you previously, the President has full constitutional authority as Chief Executive and Commander in Chief to use force against Iraq. *Id*. at 6-8. Congress most recently supported the President's authority in this context by passing H.R.J. Res. 114, Pub. L. No. 107-243, 116 Stat. 1498 (2002).

---

[1] As we have previously advised, it is the responsibility of this Office, on behalf of the Attorney General, to provide authoritative opinions for the President on all legal questions, including questions of international law. S*ee* Letter for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel (Jan. 11, 2002).

## I. UNSCR 1441

On November 8, 2002, the U.N. Security Council unanimously approved a resolution regarding Iraq. S.C. Res. 1441, U.N. Doc. S/RES/1441 (Nov. 8, 2002). UNSCR 1441 "deplor[es]" Iraq's continued failure to comply with various UNSCRs, including in particular the requirements imposed by those resolutions that Iraq: (1) fully disclose all aspects of its weapons of mass destruction ("WMD") and other nuclear programs; (2) fully and unconditionally cooperate with the United Nations Special Commission ("UNSCOM"), its successor, the United Nations Monitoring, Verification and Inspection Commission ("UNMOVIC"), and the International Atomic Energy Agency ("IAEA"); (3) provide immediate, unconditional and unrestricted access to UNMOVIC and the IAEA; (4) renounce international terrorism; (5) cease the repression of its civilian population; (6) provide access by international humanitarian organizations to all those in need of assistance in Iraq; (7) return, or cooperate in accounting for, Kuwaiti and third country nationals wrongfully detained by Iraq; and (8) return Kuwaiti property wrongfully seized by Iraq. *Id*. pmbl. ¶¶ 6-9 (2002).

UNSCR 1441 grants Iraq "a final opportunity to comply with its disarmament obligations under relevant resolutions of the Council," and specifies that, in order for Iraq to begin to comply with these obligations, it must submit a full disclosure of its WMD program within thirty days of the resolution. *Id*. ¶¶ 2, 3. It specifically requires Iraq to provide "immediate, unimpeded, unconditional, and unrestricted access to any and all, including underground, areas, facilities, buildings, equipment, records, and means of transport which [UNMOVIC and the IAEA] wish to inspect" and to all officials and other persons. *Id*. ¶ 5. Because international inspectors have been absent from Iraq since 1998, UNSCR 1441 also strengthens previous resolutions by providing UNMOVIC and the IAEA with expansive new authorities to assist them in fulfilling their mission. *Id*. ¶ 7. UNSCR 1441 directs the Executive Chairman of UNMOVIC to report immediately to the Security Council "any interference by Iraq with inspection activities, as well as any failure by Iraq to comply with its disarmament obligations, including its obligations regarding inspections under this resolution." *Id*. ¶ 11. False statements or omissions in the declarations submitted pursuant to UNSCR 1441 and failure to cooperate fully in implementing UNSCR 1441 also must be reported to the Security Council. *Id*. ¶ 4. Upon receipt of such a report, the Security Council will "convene immediately . . . in order to consider the situation and the need for full compliance with all of the relevant Council resolutions in order to secure international peace and security." *Id*. ¶ 12.

Significantly, UNSCR 1441 "[d]ecides" that Iraq "has been and remains in material breach of its obligations under relevant resolutions," in particular the obligations in UNSCR 687 regarding Iraq's WMD program. *Id*. ¶ 1. In addition, the resolution specifies that any false statements or omissions with respect to

Iraq's WMD program "shall constitute a further material breach of Iraq's obliga-tions." *Id*. ¶ 4. The resolution also reminds Iraq that the Security Council has repeatedly warned that "serious consequences" will result from the continued violation of its obligations. *Id*. ¶ 13. Finally, UNSCR 1441 twice "[r]ecall[s]" UNSCR 678 and explicitly restates the authorization in that resolution for member states "to use all necessary means to uphold and implement its resolution 660 (1990) of 2 August 1990 and all relevant resolutions subsequent to resolution 660 (1990) and to restore international peace and security in the area." *Id*. pmbl. ¶¶ 1 & 4.

Nothing in UNSCR 1441 alters our prior conclusion that the use of force against Iraq by the United States would be consistent with the U.N. Charter and international law, due to existing U.N. Security Council resolutions and the nation's inherent right of self-defense.

## II. U.N. Security Council Authorization to Use Force Against Iraq

As we explained previously, existing Security Council resolutions provide continuing authority to use force against Iraq. Enacted at the start of the Persian Gulf War, UNSCR 678 authorizes member states to use "all necessary means" to eject Iraq from Kuwait, to uphold and implement "all subsequent relevant resolutions," and "to restore international peace and security in the area." S.C. Res. 678, ¶ 2, U.N. Doc. S/RES/678 (Nov. 29, 1990); *see also* Iraq Opinion, 26 Op. O.L.C. at 176-77. One of the most significant "subsequent relevant resolu-tions" is UNSCR 687, which established the terms of the cease-fire that suspended hostilities between Iraq and the U.S.-led international coalition. S.C. Res. 687, U.N. Doc. S/RES/687 (Apr. 8, 1991). As we detailed in our earlier opinion, Iraq Opinion, 26 Op. O.L.C. at 165-66, and as the President has made clear in recent speeches, *see, e.g.*, Address to the United Nations General Assembly in New York City, 2 *Pub. Papers of Pres. George W. Bush* 1572 (Sept. 12, 2002); *see also* Statement of Prime Minister Tony Blair to the Emergency Session of the House of Commons (Sept. 24, 2002), *available at* http://news.bbc.co.uk/2/hi/uk_politics/ 2278495.stm (last visited May 7, 2012); Office of the Press Secretary, White House, *A Decade of Deception and Defiance: Saddam Hussein's Defiance of the United Nations* (Sept. 12, 2002), *available at* http://georgewbush-whitehouse. archives.gov/news/releases/2002/09/20020912.html (last visited May 7, 2012), Iraq has committed numerous material breaches of the cease-fire, in particular by continuing to develop weapons of mass destruction and by preventing U.N. inspectors from discovering and destroying these weapons. Iraq's material breaches permit the United States to suspend the cease-fire and rely on UNSCR 678 as an authorization to use force to bring Iraq into compliance with UNSCR 687 and other relevant resolutions. Further, Iraq's ongoing drive to develop weapons of mass destruction and its demonstrated hostile intentions toward its

neighbors continue to pose a serious threat to international peace and security in the region. Therefore, under UNSCR 678, the United States may use force to implement the terms of UNSCR 687 and thereby restore international peace and security in the area.

Nothing in UNSCR 1441 undermines or restricts the authority to use force granted by existing resolutions. Rather, UNSCR 1441 provides further support for the conclusion that the use of force would be appropriate under existing resolutions because it confirms that the President has sufficient grounds to find Iraq in material breach of the cease-fire. *Id*. ¶ 1. Although we believe that the United States may determine for itself whether Iraq is in material breach of UNSCR 687, *see* Iraq Opinion, 26 Op. O.L.C. at 163-66, the adoption of a resolution making that finding demonstrates that the Security Council agrees. A finding that Iraq is in material breach of UNSCR 687 or other relevant resolutions is by itself sufficient to trigger the suspension of the cease-fire and the authority to use force under UNSCR 678.[2] UNSCR 1441's finding of material breach adds further support to our authority under international law.

UNSCR 1441 does not undermine the consistent position of the United States that UNSCR 678's authorization to use force remains in effect. *See* Iraq Opinion, 26 Op. O.L.C. at 166-69. The Security Council has already reaffirmed UNSCR 678 three times. *See* S.C. Res. 686, U.N. Doc. S/RES/686 (Mar. 2, 1991); S.C. Res. 687, U.N. Doc. S/RS/687 (Apr. 8, 1991); S.C. Res. 949, U.N. Doc. S/RES/949 (Oct. 15, 1994). UNSCR 1441 neither revokes UNSCR 678's authorization to use "all necessary means" against Iraq, nor terminates the authorization in any way. The U.N. Security Council has not readily authorized the use of force in the past (indeed, it appears to have done so only in the context of seven conflicts), nor has it rescinded those decisions lightly. When the Security Council has taken the serious step of ending an authorization to use force, it has only done so in one of two ways: either by expressly terminating the prior authorization, or by setting an up-front time limit on the authorization.[3] *See, e.g*., S.C. Res. 1031, ¶ 19, U.N. Doc. S/RES/1031 (Dec. 15, 1995) (Bosnia) (deciding that "the authority to take certain measures conferred upon States by [various UNSCRs] shall be terminated"); S.C. Res. 954, ¶ 1, U.N. Doc. S/RES/954 (Nov. 4, 1994) (extending the mandate for the U.N. Mission in Somalia (UNOSOM II) for a

---

[2] UNSCR 1441 puts to rest the arguments of those commentators who claim that only the Security Council may determine whether Iraq is in material breach. *See, e.g*., Jules Lobel & Michael Ratner, *Bypassing the Security Council: Ambiguous Authorizations to Use Force, Cease-Fires and the Iraqi Inspection Regime*, 93 Am. J. Int'l L. 124, 150 (1999). Such commentators argue that the Security Council's previous resolution finding that Iraq was in material breach, which was adopted over ten years ago, is too outdated to provide a basis for suspending the cease-fire. *See id*. at 151-52; S.C. Res. 707, U.N. Doc. S/RES/707 (Aug. 15, 1991).

[3] For your convenience, we have attached an appendix listing the various UNSCRs that have authorized the use of force and their current status.

"final period" until March 31, 1995); S.C. Res. 929, ¶ 4, U.N. Doc. S/RES/929 (June 22, 1994) (Rwanda) (specifying that "the mission of Member States cooperating with the Secretary-General will be limited to a period of two months following the adoption of the present resolution," if not earlier).[4] U.N. Security Council practice has been consistent on this point over a substantial period of time. UNSCR 678, however, contains no self-imposed time-limit, and none of the resolutions relating to Iraq, including UNSCR 1441, have explicitly terminated the resolution's authorization to use force. Unless the Security Council clearly states, using the same language it has in the past, that it has terminated UNSCR 678's authorization for the use of force, that authorization continues. Instead, UNSCR 1441 twice "[r]ecall[s]" UNSCR 678 and explicitly restates the authorization in UNSCR 678 for member states "to use all necessary means to uphold and implement its resolution 660 (1990) . . . and all relevant resolutions subsequent to resolution 660 (1990) and to restore international peace and security in the area." S.C. Res. 1441, pmbl.; S.C. Res. 678, ¶ 2.[5]

Other elements of UNSCR 1441 further support our conclusion that it does not affect existing authority, under previous Security Council resolutions, to use force against Iraq. First, UNSCR 1441's warning that Iraq's continued violation of its international obligations will result in "serious consequences," read together with

---

[4] Similarly, the practice of the Security Council is to state clearly its intention to terminate sanctions imposed by previous UNSCRs. *See, e.g.*, S.C. Res. 1367, ¶ 1, U.N. Doc. S/RES/1367 (Sept. 10, 2001) (deciding "to terminate the prohibitions established by . . . resolution 1160 (1998)," which required all states to prevent the sale or supply to the Federal Republic of Yugoslavia of arms and related materièl of all types); S.C. Res. 1074, ¶ 2, U.N. Doc. S/RES/1074 (Oct. 1, 1996) (former Yugoslavia) (deciding "to terminate, with immediate effect, the measures referred to in paragraph 1 of" UNSCR 1022); S.C. Res. 1022, ¶ 4, U.N. Doc. S/RES/1022 (Nov. 22, 1995) (deciding that the Security Council "will terminate [certain] measures on the tenth day following the occurrence of the first free and fair elections" provided for in the General Framework Agreement for Peace in Bosnia and Herzegovina); S.C. Res. 1011, ¶ 8, U.N. Doc. S/RES/1011 (Aug. 16, 1995) (deciding that "on 1 September 1996 the restrictions imposed by paragraph 13 of resolution 918 (1994) on the sale or supply of military arms and related *materièl* to the Government of Rwanda shall terminate, unless the Council decides otherwise after its consideration of the second report of the Secretary-General"); S.C. Res 944, ¶ 4, U.N. Doc. S/RES/944 (Sept. 29, 1994) (deciding "to terminate the measures regarding Haiti set out in [various] resolutions . . . at 001 a.m. EST on the day after the return to Haiti of President Jean-Bertrand Aristide"); S.C. Res. 919, ¶¶ 1, 2, U.N. Doc. S/RES/919 (May 26, 1994) (deciding "to terminate forthwith the mandatory arms embargo and other restrictions related to South Africa imposed by resolution 418 (1977) . . . [and] to end forthwith all other measures against South Africa contained in resolutions of the Security Council"); S.C. Res. 460, ¶ 2, U.N. Doc. S/RES/460 (Oct. 21, 1979) (deciding "to call upon Member States to terminate the measures taken against Southern Rhodesia under Chapter VII of the Charter pursuant to resolutions 232 (1966), 253 (1968) and subsequent related resolutions on the situation in Southern Rhodesia").

[5] We do not read UNSCR 1441's referral to UNSCR 678 in the past tense as an indication that the authorization in that resolution has expired. *See* S.C. Res. 1441, pmbl. ¶ 4 ("*[r]ecalling* that resolution 678 (1990) authorized member States to use all necessary means"). Instead, the past tense appears to have been used because it is describing a previously adopted resolution. For example, UNSCR 1441 describes obligations "imposed" by USCR 687, and there is absolutely no doubt that that resolution continues in effect. S.C. Res. 1441, pmbl. ¶ 5.

its references to UNSCR 678, suggest that the Security Council views such serious consequences as including the use of force under UNSCR 678.[6] S.C. Res. 1441, ¶ 13. Second, under general principles of armistice law, the cease-fire under UNSCR 687 suspended hostilities between the parties to the Persian Gulf War, but did not extinguish the Security Council's authorization to use force. *See* Iraq Opinion, 26 Op. O.L.C. at 167-70. Third, nothing in UNSCR 1441 precludes the United States from assessing for itself whether the authorization in UNSCR 678 remains in effect. Just as the Security Council has terminated authorizations to use force using only clear and unambiguous language, it also has been clear and unambiguous when it has wanted the Security Council itself, rather than individual member states, to determine whether an authorization continues in effect. *See* S.C. Res. 940, ¶ 8, U.N. Doc. S/RES/940 (July 31, 1994) (Haiti) (deciding "that the multinational force will terminate its mission . . . when a secure and stable environment has been established . . . [as determined] by the Security Council, taking into account recommendations from the Member States of the multinational force"). UNSCR 1441 contains no such clear and unambiguous statement.

It should be noted that UNSCR 1441 contains two provisions that might cast doubt on the continuing authorization to use force against Iraq under previous U.N. Security Council resolutions. We believe, however, that these two paragraphs only promise further review of Iraqi failure to comply with the new inspection regime. The first, paragraph 2, while "acknowledging" Iraq's previous material breaches, "[d]ecides . . . to afford Iraq, by this resolution, a final opportunity to comply with its disarmament obligations under the relevant resolutions of the Council." This language might be read by some to suggest that no action will be taken against Iraq until Iraq has had time to comply with its disarmament obligations under the framework of the new resolution. Paragraph 2, however, cannot constitute a legal repeal of existing international legal authority to use force against Iraq. As explained above, the Security Council has always used clear and unambiguous language when it intends to terminate an authorization to use force. UNSCR 1441 does not impose a new sunset date, nor does it use the clear and unambiguous termination language that previous Security Council resolutions have employed when rescinding authorizations to use force. As a legal matter,

---

[6] Twice before, military force against Iraq has followed warnings by the Security Council that Iraq's continued intransigence would result in serious consequences. On January 8 and 11, 1993, the President of the Security Council warned Iraq that "serious consequences" would follow if it failed to comply with its international obligations. *See* S.C. Pres. Statement 1993/25091, U.N. Doc. S/PRST/25091 (Jan. 11, 1993); S.C. Pres. Statement 1993/25081, U.N. Doc. S/PRST/25081 (Jan. 8, 1993). Shortly thereafter, on January 13, 1993, President George H.W. Bush ordered an air attack on surface-to-missile sites and related facilities in the southern no-fly zone. And the December 1998 airstrikes against Iraq followed a late-October 1997 warning by the President of the Security Council that "serious consequences" would result if Iraq failed to comply unconditionally and immediately with its international obligations. S.C. Pres. Statement 1997/49, U.N. Doc. S/PRST/1997/49 (Oct. 29, 1997); *see also* S.C. Res. 1137, pmbl., U.N. Doc. S/RES/1137 (Nov. 12, 1997) (recalling that statement).

nothing in paragraph 2 alters the existing authorization in UNSCR 678 for member States to use "all necessary means" to uphold and implement UNSCR 687 and other relevant resolutions and to restore international peace and security to the area. If paragraph 2 sought to suspend or repeal existing authority under UNSCR 678 to use force, it would have employed clear and unambiguous language equivalent to the "terminate" provisions or sunset dates used in previous resolutions. *See infra* Appendix.[7]

Nor could paragraph 2 alter the international law principle that, in response to Iraq's previous material breaches of the cease-fire, the United States may, at any time, suspend the cease-fire and rely on the authorization to use force against Iraq. *See* Iraq Opinion, 26 Op. O.L.C. at 166-75. We do not read paragraph 2 as containing a clear agreement by the parties to the cease-fire, codified by UNSCR 687, to modify its terms in any way. Certainly there is no clear statement that paragraph 2, or any other part of UNSCR 1441, seeks to alter the terms of the 1991 cease-fire.

Paragraph 12 of UNSCR 1441 states that the Security Council will convene immediately upon a report of Iraqi noncompliance by the Executive Chairman of UNMOVIC "to consider the situation and the need for full compliance with all of the relevant Council resolutions in order to secure international peace and security." Although some might read this language to preclude the unilateral use of force against Iraq until the Security Council had held such a meeting, this interpretation would be in error. Paragraph 12 does not alter our view that, under principles of both treaty and armistice law, the United States may, at any time, unilaterally suspend the cease-fire and rely on the authorization in UNSCR 678 to resume hostilities in response to Iraq's prior material breaches. *See* Iraq Opinion, 26 Op. O.L.C. at 166, 173; *see also* Ruth Wedgwood, *The Enforcement of Security Council Resolution 687: The Threat of Force Against Iraq's Weapons of Mass Destruction*, 92 Am. J. Int'l L. 724, 726-27 (1998) (discussing U.S. right to use force unilaterally to "vindicate" the Iraqi inspection regime). At most, paragraph 12 only ensures that the U.N. Security Council will convene immediately to address further material breaches by Iraq. Simply requiring another meeting holds open the possibility of additional Security Council action, but does not eliminate past decisions and authorities. Paragraph 12, therefore, has no effect on the remedies available under international law in response to Iraq's previous and ongoing material breaches of the cease-fire. A decision by the Security Council to convene immediately in the event of Iraqi noncompliance cannot amount to a

---

[7] Even if paragraph 2 were to be read to limit the use of force while Iraq undertook to comply with UNSCR 1441, any Iraqi breach of UNSCR 1441 itself would exhaust its "final opportunity" to comply with its disarmament obligations. *See* S.C. Res. 1441, ¶ 4 (failure by Iraq at any time to comply with or cooperate fully in the implementation of UNSCR 1441 constitutes a further material breach of its obligations). This would provide yet another independent basis for the use of force under UNSCR 678.

suspension or repeal of the substantive authorization to use force granted by existing U.N. Security Council resolutions.

### III. Conclusion

UNSCR 1441 does not alter the legal authority, under international law, granted by existing U.N. Security Council resolutions to use force against Iraq. We also emphasize that a U.N. Security Council authorization is not a necessary precondition under international law for the use of force. Under the doctrine of anticipatory self-defense, the United States may use force against Iraq if the President determines the use of force would be necessary due to an imminent threat, and a proportional response to that threat.[8] We refer you to our Oct. 23, 2002 Iraq Opinion for a complete examination of self-defense under international law and its application to Iraq. *See generally id*., 26 Op. O.L.C. at 177-97.

JOHN C. YOO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[8] The United States has consistently taken the position that the inherent right to self-defense under international law is not limited to responding to actual armed attacks. *See* Iraq Opinion, 26 Op. O.L.C. at 185-87; Memorandum for William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Constraints to Boarding and Searching Foreign Vessels on the High Seas* at 10 (June 13, 2002).

## Appendix

## UNSCRs Authorizing the Use of Force

### Korea

UNSCR 83 "*[r]ecommends* that the Members of the United Nations furnish such assistance to the Republic of Korea as may be necessary to repel the armed attack and to restore international peace and security in the area." S.C. Res. 83, U.N. Doc. S/RES/83 (June 27, 1950).

Termination: This resolution does not appear to have been terminated.

### Iraq

UNSCR 678, "*[a]cting* under Chapter VII of the Charter . . . , *[a]uthorizes* Member States co-operating with the Government of Kuwait, unless Iraq on or before 15 January 1991 fully implements . . . the aforementioned resolutions, to use all necessary means to uphold and implement resolution 660 (1990) and all subsequent relevant resolutions and to restore international peace and security in the area." S.C. Res. 678, ¶ 2, U.N. Doc. S/RES/678 (Nov. 29, 1990).

Termination: This resolution has not been terminated.

### Somalia

UNSCR 794, "*[a]cting* under Chapter VII of the Charter of the United Nations, *authorizes* the Secretary-General and Member States cooperating . . . to use all necessary means to establish as soon as possible a secure environment for humanitarian relief operations in Somalia." S.C. Res. 794, ¶ 10, U.N. Doc. S/RES/ 794 (Dec. 3, 1992).

UNSCR 814 expanded the U.N. Operation in Somalia ("UNOSOM II") "for an initial period through 31 October 1993, unless previously renewed by the Security Council." S.C. Res. 814, ¶ 6, U.N. Doc. S/RES/814 (Mar. 26, 1993).

Termination: UNSCR 954 "decides to extend the mandate for UNOSOM II for a final period until 31 March 1995." S.C. Res. 954, ¶ 1, U.N. Doc. S/RES/954 (Nov. 4, 1994).

### Rwanda

UNSCR 929, "*[a]cting* under Chapter VII of the Charter of the United Nations, *authorizes* the Member States cooperating with the Secretary-General to conduct the operation referred to in paragraph 2 above using all necessary means to achieve [certain] humanitarian objectives." S.C. Res. 929, ¶ 3, U.N. Doc. S/RES/

929 (June 22, 1994). (Paragraph 2 welcomes the establishment of a temporary operation under national command and control aimed at contributing to the security and protection of displaced persons, refugees, and civilians at risk in Rwanda.)

Termination: UNSCR 929 contains its own termination date, specifying that "the mission of Member States cooperating with the Secretary-General will be limited to a period of two months following the adoption of the present resolution," if not earlier. *Id*. ¶ 4.

### Haiti

UNSCR 940, "*[a]cting* under Chapter VII of the Charter of the United Nations, *authorizes* Member States to form a multinational force under unified command and control and, in this framework, to use all necessary means to facilitate the departure from Haiti of the military leadership, consistent with the Governors Island Agreement, the prompt return of the legitimately elected President and the restoration of the legitimate authorities of the Government of Haiti, and to establish and maintain a secure and stable environment that will permit implementation of the Governors Island Agreement." S.C. Res. 940, ¶ 4, U.N. Doc. S/RES/940 (July 31, 1994).

Termination: UNSCR 940 "*[d]ecides* that the multinational force will terminate its mission . . . when a secure and stable environment has been established," as determined by the Security Council, taking into account recommendations from Member States of the multinational force ("MNF"). *Id*. ¶ 8. In UNSCR 975, the Security Council made such a determination and provided for a full transfer of responsibility from the MNF to the U.N. Mission in Haiti by March 31, 1995. S.C. Res. 975, ¶¶ 5, 7, U.N. Doc. S/RES/975 (Jan. 30, 1995).

### Former Yugoslavia

UNSCR 770 "*[c]alls upon* States to take nationally or through regional agencies or arrangements all measures necessary to facilitate in coordination with the United Nations the delivery by relevant United Nations humanitarian organizations and others of humanitarian assistance to Sarajevo and wherever needed in other parts of Bosnia and Herzegovina." S.C. Res. 770, ¶ 2, U.N. Doc. S/RES/770 (Aug. 13, 1992).

UNSCR 781 "*[c]alls upon* States to take nationally or through regional agencies or arrangements all measures necessary to provide assistance to the United Nations Protection Force [UNPROFOR], based on technical monitoring and other capabilities" to monitor compliance with the ban on military flights. S.C. Res. 781, ¶ 5, U.N. Doc. S/RES/781 (Oct. 9, 1992).

UNSCR 816 "*[a]uthorizes* Member States . . . to take, under the authority of the Security Council . . . all necessary measures in the airspace of the Republic of Bosnia and Herzegovina . . . to ensure compliance with the" flight ban. S.C. Res. 816, ¶ 4, U.N. Doc. S/RES/816 (Mar. 31, 1993).

UNSCR 836 "*[d]ecides* that . . . Member States, acting nationally or through regional organizations or arrangements, may take, under the authority of the Security Council . . . all necessary measures, through the use of air power, in and around the safe areas in the Republic of Bosnia and Herzegovina, to support UNPROFOR." S.C. Res. 836, ¶ 10, U.N. Doc. S/RES/836 (June 4, 1993).

UNSCR 844 "*[r]eaffirms* its decision in . . . resolution 836 (1993) on the use of air power, in and around the safe areas, to support UNPROFOR in the performance of its mandate." S.C. Res. 844, ¶ 4, U.N. Doc. S/RES/844 (June 18, 1993).

UNSCR 958 "*[d]ecides* that the authorization given in [UNSCR 836] shall apply also to such measures taken in the Republic of Croatia." S.C. Res. 958, pmbl., U.N. Doc. S/RES/958 (Nov. 19, 1994).

Termination: UNSCR 1031 states that "with effect from the day on which the Secretary-General reports to the Council that the transfer of authority from the United Nations Protection Force (UNPROFOR) to IFOR [a multinational implementation force] has taken place, the authority to take certain measures conferred upon States by resolutions [770, 781, 816, 836, 844 and 958] shall be terminated." S.C. Res. 1031, ¶ 19, U.N. Doc. S/RES/1031 (Dec. 15, 1995).

UNSCR 1031 "*[a]uthorizes* . . . Member States . . . to take all necessary measures to effect the implementation of and to ensure compliance with Annex I-A of the Peace Agreement . . . [and] to ensure compliance with the rules and procedures, to be established by the Commander of IFOR, governing command and control of airspace over Bosnia and Herzegovina with respect to all civilian and military air traffic . . . [and] to take all necessary measures, at the request of IFOR, either in defence of IFOR or to assist the force in carrying out its mission, and *recognizes* the right of the force to take all necessary measures to defend itself from attack or threat of attack." *Id*. ¶¶ 14-17.

Termination: UNSCR 1031 itself "*[d]ecides*, with a view to terminating the authorization [provided for in the resolution] one year after the transfer of authority from UNPROFOR to IFOR, to review by that date and to take a decision whether that authorization should continue, based upon the recommendations from the States participating in IFOR and from the High Representative through the Secretary General." *Id*. ¶ 21. IFOR has been replaced by a multinational stabilization force ("SFOR"). S.C. Res. 1088, ¶ 18, U.N. Doc. S/RES/1088 (Dec. 12, 1996). The most recent relevant resolution is UNSCR 1423, which authorizes the use of force by Member States in support of SFOR in situations similar to those delineated in UNSCR 1031. S.C. Res. 1423, ¶¶ 10-13, U.N. Doc. S/RES/1423 (July 12, 2002).

**East Timor**

UNSCR 1264, "*[a]cting* under Chapter VII of the Charter of the United Nations, . . . *[a]uthorizes* the establishment of a multinational force under a unified command structure, pursuant to the request of the Government of Indonesia . . . and *authorizes* the States participating in the multinational force to take all necessary measures to fulfill [their] mandate." S.C. Res. 1264, ¶ 3, U.N. Doc. S/RES/1264 (Sept. 15, 1999).

Termination: This authorization appears to continue in effect. The most recent resolution is UNSCR 1410, which establishes for 12 months from May 20, 2002 a U.N. Mission of Support in East Timor ("UNMISET"), including a civilian police and a military component. S.C. Res. 1410, ¶¶ 1-3, U.N. Doc. S/RES/1410 (May 17, 2002). UNSCR 1410 "reaffirms" UNSCR 1272, which, in turn, "welcomes" the deployment of the multinational force to East Timor pursuant to UNSCR 1264. S.C. Res. 1272 (1999), pmbl., U.N. Doc. S/RES/1272 (Oct. 25, 1999).